```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


AMERICAN RIVER TRANSPORTATION CO.       *      CIVIL ACTION

VERSUS                                  *      NO. 06-6103

MORTON INTERNATIONAL, INC.              *      SECTION "F"
AND DIAMOND SERVICES CORP.
```

ORDER AND REASONS

Before the Court is Morton International's motion for partial summary judgment against the Diamond Group and its insurer, Houston Casualty Insurance Company, on indemnity and insurance issues. For the reasons that follow, the motion is DENIED.

Background

This lawsuit involves the breakaway of a number of barges from Morton International's Carlin fleet during Hurricane Rita. Twenty of the barges were owned by American River Transportation Company (ARTCO), which sued Morton and the Diamond Group, the owner of the tugboat M/V DIAMOND VII, for salvage and repair costs, contractual relief, and indemnity. In turn, Morton sued Diamond and its insurer, Houston Casualty Insurance Company (HCC), for contractual indemnification and for coverage as an additional insured under

1

Diamond's insurance policy, pursuant to the terms of the Tug Boat Service Contract between Morton and Diamond. Morton asks the Court to enter summary judgment in its favor on both claims.

## I. Summary Judgment Standard

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine issue as to any material fact such that the moving party is entitled to judgment as a matter of law. No genuine issue of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio., 475 U.S. 574, 586 (1986). A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Id. at 249-50 (citations omitted). Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with

competent evidence, such as affidavits or depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987). Finally, in evaluating the summary judgment motion, the court must read the facts in the light most favorable to the non-moving party. Anderson, 477 U.S. at 255.

## II. Defense and Indemnity

### A.

All parties agree that maritime law governs this dispute. Randall v. Chevron U.S.A., Inc., 13 F.3d 888, 894 (5th Cir. 1994) (overruled on other grounds). When interpreting a maritime contract, the general rules of contract construction and interpretation apply. See Marine Overseas Services, Inc. v. Crossocean Shipping, Co. Inc., 791 F.2d 1227 (5th Cir. 1986); Ogea v. Loffland Brothers Co., 622 F.2d 186 (5th Cir. 1980). Each provision of a contract must be read in light of others so as to give each the meaning reflected by the contract as a whole. Southwestern Engineering Co. V. Cajun Elec. Power Co-op., Inc., 915 F.2d 972 (5th Cir. 1990). Finally, each provision of a contract must be given a meaning which renders it, along with all other provisions, effective rather than meaningless. See Lewis v. Hamilton, 652 So.2d 1327 (La. 1995).

The Fifth Circuit has noted that "[a] contract of indemnity should be construed to cover all losses, damages, or liabilities

which reasonably appear to have been within the contemplation of the parties." Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 333 (5th Cir. 1981). However, the Fifth Circuit cautions, "it should not be read to impose liability for those losses or liabilities which are neither expressly within its terms nor of such a character that it can be reasonably inferred that the parties intended to include them within the indemnity coverage." Id.

The defense and indemnity provision of the Tug Boat Service Contract instructs that Diamond will release, indemnify, defend and hold harmless Morton Group from any claim or liability "resulting from, arising out of, or in any way related to, directly or indirectly":

> (i) any negligent act or omission of [Diamond] in connection with the Contract, regardless of fault of the Morton Group;
> (ii) [Diamond's] improper performance or improper failure to perform under the contract, regardless of fault of the Morton Group; . . .
> (iv) any breach of warranty, breach of contract, misrepresentation or false certification, or failure to exercise due care by [Diamond], regardless of fault of Morton Group.

Because Diamond's indemnification duty is not unconditional, the question before the Court, therefore, is whether Diamond was negligent or failed to perform as required by the contract.

B.

Carlin fleet is a modest facility that consists of four steel mooring structures on each side of Bayou Carlin near Weeks Island. According to the pre-hurricane mooring plan devised by Bryce Lewis, a Morton engineer responsible for implementing Morton's Hurricane

Preparedness Plan,[1] Diamond was instructed to tie together all the barges in a single block on the eastern side of the bayou. This was to be achieved by mooring four barges to the steel dolphins along the eastern shore using the two-inch polypropylene rope provided by Morton. Diamond was instructed to tie a second row of four barges to the row that was moored to the steel dolphins, and a third row of four barges to the second row, and so on, until there were six rows; only the first row was moored to the shore.

The loaded barges were placed in the inner four rows, and the empty barges were placed in the outside two rows. With respect to the connections *between* the barges, Lewis instructed that "all barges [are to be] 3-part tied together. If the empty barges cannot be 3-part tied to the loaded barges, 2-part ties with the wire rope and additional rope ties are acceptable." These instructions were given to Captain Thibodeaux of the M/V DIAMOND VII on the morning of September 22, 2005.

First, Morton alleges that Diamond was negligent for failing to leave slack in the mooring lines to accommodate for the storm surge. At his deposition, Captain Thibodeaux acknowledged the need to loosen mooring lines to accommodate for rising sea levels to prevent the lines from snapping. Indeed, he adjusted the lines on the DIAMOND VII several times during Hurricane Rita while the vessel was moored in the Port of Iberia. But the Court cannot say

---

[1] Morton agreed to establish its Hurricane Preparedness Plan in 2003 in response to ARTCO's concerns that its safety protocols were insufficient.

that no material fact issues exist as to whether Diamond's failure to leave slack when mooring the barges at Carlin fleet on September 22, 2005 triggers indemnification under the contract. Morton instructed Captain Thibodeaux to moor the barges two days before the hurricane hit, and Morton released the DIAMOND VII from further duty at Carlin fleet on the evening of September 22, 2008.[2] Diamond contends that if Captain Thibodeaux left twelve feet of slack in the barges' mooring lines as much as 40 hours before the water level rose high enough to snap the lines, the barges would have jostled about on the loose lines during the many hours *before* the surge came up. Both of the expert reports on the record are critical of Morton's fleeting plan, but neither report comments specifically on whether Diamond should have left slack in the mooring lines. Nor do Captain Thibodeaux's actions onboard the M/V DIAMOND VII at the Port of Iberia on September 24 do anything but highlight serious fact issues. According to Diamond, Captain Thibodeaux adjusted the mooring lines on the DIAMOND VII as the surge came up during the hurricane--not to create slack, but to keep the mooring lines tight while allowing for the rising seas. Thibodeaux and the M/V DIAMOND VII were released from duty and in no position to adjust the barge moorings at Carlin fleet during the

---

[2] The Hurricane Preparedness Plan provides that 48-24 hours before a hurricane is forecasted to strike Weeks Island, "[t]he tugboat shall be released following completion of barge loading and securing of the barges at Carlin fleet."

storm.[3]

In addition, Morton contends that Diamond breached its duty to maintain "all necessary equipment" to fleet the barges, as required by the Tug Boat Service Contract:

> [Diamond] shall provide a 600 HP twin screw tug boat (the "Tug") with all necessary equipment, staffed with a licensed captain and the necessary crew to fleet and move barges on a seven day per week, 24 hour per day basis as necessary for the safe and efficient barge loading and fleeting.... [Diamond] shall perform all barge loading and fleeting work as requested by Morton.
> . . .
> The Tug will be used exclusively for Morton work. The Tug will leave Morton's property only after having received prior permission from Morton personnel except when fleeting barges. Upon written request of [Diamond], Morton shall furnish fuel, motor oil and rope as required to perform the Work.

Specifically, Morton asserts that M/V DIAMOND VII: (1) did not carry a sufficient amount of hard wire, and, consequently, some of the barges were tied together with rope; (2) did not carry enough rigging or rope to secure the tiers of barges together with tie-

---

[3] Morton further asserts that Diamond's corporate representative, Lisa Bonin, acknowledged the importance of leaving adequate slack in mooring lines to accommodate for rising water. But her testimony was in reference to Captain Thibodeaux's loosening the DIAMOND VII's mooring during the storm, not leaving slack in the mooring lines at Carlin fleet two days earlier. Morton also contends that Bonin's alleged admission that Diamond failed to properly anticipate the effects of the hurricane equates with negligence. Morton is entitled to make this argument at trial. The significant and material factual disputes as to what, if anything, Diamond could have done on the morning of September 22 to accommodate for the storm surge--while at the same following the fleeting instructions provided by Bryce Lewis--prevent this Court from making a summary determination on whether Diamond's alleged ignorance of the weather forecasts had anything to do with the breakaway.

offs at every barge; and (3) did not carry adequate ratchets, which allegedly could have been used to tighten the cable connections between the barges. Additional wire, rope, and ratchets, Morton submits, would have prevented the block of barges from breaking apart, allowing ARTCO to salvage all 20 barges from a single location on the marshland, rather than many different locations.

Here, too, Diamond has raised material fact issues as to whether it failed to carry the necessary fleeting equipment onboard the DIAMOND VII. Bryce Lewis directed Diamond to tie the barges with three-part ties where possible and soft line where three-part ties were not possible. When asked in his deposition whether Diamond carried out these directions, Lewis testified, "[t]o the best of my knowledge, what I directed them to do was completed." When asked whether Diamond disobeyed any directions, Lewis responded, "not to my knowledge."[4] In addition, neither side has presented evidence about whether "ratchets" are necessary equipment based on industry standards. The "necessary equipment" clause in

---

[4] According to Morton's Hurricane Preparedness Plan, within 48-24 hours of a hurricane strike: "All barges shall be secured in accordance with industry practice. The method of securing the barges shall be reviewed with all parties involved to insure it is adequate. A final visual check shall be performed of all barges in the fleet by a Morton employee to be designated by the Facility management. Pictures shall be taken of the tied-up barges." Apparently, no pictures were taken and Morton did not perform a final visual inspection of the fleet. On the record evidence, the Court cannot conclude that Diamond breached its obligation under the Tug Boat Service Contract to "perform all barge loading and fleeting work *as requested by Morton*" (emphasis added). How the state of this record does not serious and patently define fact issues that are wholly inappropriate for summary treatment, and that the litigants must be aware of, remains a mystery to this Court.

the Tug Boat Service Contract had been in place for many years, and it appears from the record that Morton had always known that the DIAMOND VII is not equipped with ratchets. Only in hindsight and for the purpose of indemnification, Diamond submits, does Morton now assert this equipment was necessary.

The Court also notes the existence of factual disputes as to whether Diamond's alleged lack of rope and other rigging equipment is affected by: (1) Morton's written policy that, within 120-96 hours of a hurricane strike, "[a]dditional rope shall be purchased, if necessary, for securing barges"; and (2) Morton's acceptance of a delivery of six empty barges from the M/V BROOKS RYAN on September 21, 2008, allegedly in violation of Morton's pre-hurricane policy to cancel barge deliveries.[5] Morton's pre-hurricane conduct might well become relevant to the extent that it may have deprived Diamond with the ability to carry out its assignment. There remain significant fact disputes on this issue.

In short, Morton argues that Diamond's alleged failure to leave slack in the mooring lines, anticipate the storm surge, and stock the necessary equipment on board the M/V DIAMOND VII constitute negligence and breach of contract, triggering Diamond's indemnity obligation. But the record is overwhelmed by fact issues.

Morton has not carried its summary judgment burden to show that Diamond was negligent or failed to perform under the contract. Therefore, Morton's motion for partial summary judgment enforcing

---

[5] Morton has not established that it canceled the M/V BROOKS RYAN barge delivery.

Diamond's indemnity obligation is denied.[6]

### III. Insurance Coverage

Morton contends it is entitled to coverage as an additional insured under the wharfingers liability clause in Diamond's insurance policy. Morton relies on Paragraph 5(a) of the Tug Boat Service Contract, which obligates Diamond to purchase Comprehensive General Liability, Protection and Indemnity Insurance, and Hull and Machinery Insurance, and maintain specific policy limits on each policy. In addition, Diamond is further required to obtain:

> [A]ny other necessary marine insurance coverage to protect [Diamond] and Morton Group for [Diamond's] operation in fulfilling the terms of this Contract and any other work performed for or on behalf of Morton Group.

Further, Paragraph 5(a)(i) instructs that all insurance policies "required under [sub-paragraph 5(a)]" shall be endorsed to provide:

> [F]ull coverage to Morton Group as an additional insured without limiting coverage to liability 'as owner of the vessel' and to delete any 'as owner' clause or any other language purporting to limit coverage to liability of an insured 'as owner of the vessel....'

Morton submits that wharfingers insurance is "necessary marine insurance" under Paragraph 5(a), because Diamond's "operation[s] in fulfilling the terms of this Contract" explicitly include: "perform[ing] all barge loading and fleeting work as requested by

---

[6]Because summary judgment on indemnity is denied, the Court does not consider whether ARTCO would also be entitled to indemnity under the Tug Boat Service Contract as a "contractor" of Morton.

Morton" and providing the equipment and crew for "safe and efficient barge loading and fleeting" at Carlin fleet. HCC, on the other hand, suggests that Diamond's only "operation" in connection with the contract was being a tugboat: receiving barges, shifting them within Carlin fleet, towing them to and from Morton's salt-loading facility at Weeks Island, and so forth. HCC contends that these are quintessentially tugboat operations, and do not suggest the need for wharfingers insurance.

Indeed, although Morton asks this Court to rule that wharfingers insurance was "necessary," Morton has not directed this Court to any case law or treatise to explain why this is so. Wharfinger's insurance is typically maintained by owners of docks, wharfs, or moorings. Blacks Law Dictionary defines a wharfinger as the "owner or occupier of a wharf; one who keeps a wharf to receive merchandise for forwarding or delivery to a consignee." Leading law treatises also define the duties of a wharfinger in reference to ownership and maintenance of docks. <u>See</u>, <u>e.g.</u>, 94 Corpus Juris Secundum § 39 (2008) ("Docks must be maintained in good condition, vessels tied to them must be seaworthy and properly moored, and the dock owner must anticipate harm from passing vessels and guard against such damage. The proprietor is required to use reasonable care to keep the dock in such a state as to be reasonably safe for use by vessels which he or she invites to enter it, or for which he or she holds it out as fit and ready.")

Morton has also failed to explain why wharfingers should be considered "necessary insurance" under Paragraph 5(a) of the Tug

11

Boat Services Contract when, in fact, all parties agree that Diamond's P&I Insurance provides Morton with the coverage Morton seeks under the wharfingers clause. It is not disputed that Diamond's P&I insurance policy names Morton as an additional insured, and HCC concedes that Morton is entitled to defense and indemnification against ARTCO's claims under that provision. This suggests that wharfingers is quite unnecessary to protect Morton's interests, since those interests are protected under Diamond's P&I coverage. Morton has failed to establish it is entitled to wharfingers coverage and its motion for summary judgment on this issue is denied.

## IV. Penalties and Attorney's Fees

Morton contends that it is entitled to an award of penalties and attorney's fees from HCC pursuant to Louisiana Revised Statute § 22:1220 and § 22:658, which provide relief to insurance claimants whose claims have been adjusted in bad faith. Section 22:658 entitles an insured to statutory penalties if an insurer refuses to provide coverage for proven losses within thirty days of receiving satisfactory proof of loss, if such failure is found to be "arbitrary, capricious, or without probable clause." Similarly, § 22:1220 permits an insured to recover consequential damages that may ensue from an insurer's failure to pay a claim within 60 days of receiving satisfactory proof of loss, if the delay is "arbitrary, capricious, and without probable cause," or from an insurer's knowing misrepresentation of "pertinent facts or insurance policy provisions."

Both statutes are penal in nature and must be strictly construed. <u>Boudreaux v. State Farm Mut. Auto. Ins. Co.</u>, 896 So.2d 230, 233 (La. App. 4th Cir. 2005). To recover, a claimant must show that the insurer: (1) received a satisfactory proof of loss; (2) the insurer failed to pay the claim within the applicable statuary period; and, (3) the insurer's failure to pay was arbitrary, capricious or without probable cause. <u>Boudreaux</u>, 896 So.2d at 233. An insurer's failure to pay is not arbitrary, capricious or without probable cause if the insurer has acted in good faith reliance on a reasonable defense to the claims or if there is a reasonable disagreement between the insured and the insurer as to the amount of the loss. <u>Sibley v. Insured Lloyds</u>, 442 So.2d 627, 632 (La. App. 1st Cir. 1983). While a court may disagree with the interpretation the insurer places upon its policy, its actions in refusing to pay should not necessarily subject it to penalty provisions. <u>Stewart v. Louisiana Farm Bureau. Mut. Ins. Co.</u>, 420 So.2d 1217, 1220 (La. App. 3rd Cir. 1982). Indeed, the Fifth Circuit has observed that, "[a]lthough some Louisiana courts have found an insurer's denial to be arbitrary and capricious when the insurer incorrectly interprets coverage, it is not apparent from the statute that the Louisiana legislature intended insurers to pay penalties whenever they err in their interpretation of coverage." <u>Woods v. Dravo</u>, 887 F.2d 618, 623 (5th Cir. 1989).

### A.

Morton first seeks relief under § 22:1220(B)(1) for misrepresentations that it claims HCC made its October 26, 2007

13

letter denying insurance coverage. HCC wrote that, under Paragraph 5 of the Tug Boat Service Contract, "Morton's status as an additional assured is only activated once a finding is made that Diamond B was either solely or partially at fault in connection with the loss." Because there was no such finding of fault, HCC explained, the contractual insuring provisions did not require HCC to provide coverage. However, unlike the contractual indemnity provisions in Paragraph 4 of the Tug Boat Contract, discussed above, the insuring provisions in Paragraph 5 are not tied to a showing of Diamond's fault in connection with the loss. See, e.g., Diamond Offshore Co. v. A&B Builders, Inc., 302 F.3d 531, 551 (5th Cir. 2002) (insuring provisions not dependent on indemnity).[7] Morton argues that HCC's initial claim that insurance was not owed under the Tug Boat Contract, as well as HCC's later assertion that Morton was not entitled to the benefit of Diamond's wharfingers coverage, were knowing misrepresentations of insurance coverage provisions and therefore entitle Morton to penalties under § 22:1220(B)(1).

HCC's denial of coverage in the October 26, 2007 letter, however, was based on HCC's interpretation of the terms of the Tug Boat Contract, not the terms of the insurance policy itself. Even so, Morton has failed to show that these were "knowing

---

[7] In fact, all parties now agree that Diamond's insurance obligations in Paragraph 5 are not conditioned on a showing of Diamond's fault, and HCC has acknowledged a duty to provide coverage to Morton as an additional insured pursuant to the terms of the Tug Boat Contract.

14

misrepresentations," rather than simply disagreements of interpretation. See Woods v. Dravo, 887 F.2d 618, 623 (5th Cir. 1989). HCC's denial of wharfingers coverage is also not actionable under § 22:1220, because Morton has not shown it is entitled to that coverage. Morton also presents correspondences between Morton's and HCC's counsel that purport to show that HCC failed to disclose pertinent facts related to defenses to coverage and an alleged conflict of interest between Morton and HCC. HCC has raised fact issues as to when these alleged coverage defenses and conflict of interest arose.[8] In any case, Morton has not provided evidence to show that these amount to "knowing misrepresentations" under § 22:1220(B)(1).

In addition, Morton claims that HCC failed to provide payment of claims within the statutory time periods after receiving proof of loss, erroneously refused to reimburse Morton for its costs in offloading cargo from the grounded barges, and paying Morton's costs in defending this lawsuit. Morton has not presented evidence to establish that HCC's conduct was "arbitrary, capricious, or without probable cause." Morton is entitled to advance these claims for bad faith penalties at trial, but summary judgment is patently not appropriate on this record and must be denied.[9]

---

[8] For example, HCC points out that the conflict of interest did not come into being until ARTCO filed a third supplemental complaint clarifying its breach of contract claims against Morton.

[9] All counsel are respectfully cautioned to become familiar with the provisions of 28 U.S.C. § 1927 regarding the conduct of vexatious litigation.

Accordingly,

IT IS ORDERED: Morton's motion for partial summary judgment for indemnity from Diamond is DENIED.

IT IS FURTHER ORDERED: Morton's motion for partial summary judgment required HCC to provide coverage under the wharfingers legal liability provision is DENIED.

IT IS FURTHER ORDERED: Morton's motion for penalties under Louisiana bad faith statutes is DENIED.

New Orleans, Louisiana, June 13, 2008.

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT COURT